UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DOCUMENT TECHNOLOGIES, LLC )
)
)
*Plaintiff,* )
)
v. ) Case No. 1:19-cv-3257
)
DAVID HESS )
)
*Defendant.* )
)

## MEMORANDUM OPINION

Plaintiff Document Technologies, LLC ("DTI") has filed an application with this Court for a Temporary Restraining Order ("TRO") against defendant David Hess. ECF No. 7. Mr. Hess opposes the TRO application. ECF No. 10. For the reasons set forth below, the Court will deny DTI's request for a TRO.

## BACKGROUND

DTI is a company that provides on-site services to law firms. These services include procurement of personnel, procurement of equipment, technology solutions, scanning/printing/copying, mailing/shipping/faxing, supply management, facilities management, etc. Mr. Hess began working for DTI in June of 2015 as a Site Manager and was promoted to Senior Operations Manager in October of 2017. His promotion made him second-in-command for DTI's Mid-Atlantic Region, which includes operations in the D.C., Baltimore, and Northern Virginia areas ("DMV area"). His responsibilities included servicing and growing client accounts, fostering relationships with potential new clients, managing approximately 115 DTI employees, training DTI employees, and assisting James Ferguson (DTI's Regional Director of

1

Operations for the Mid-Atlantic Region) with all aspects of regional operations. All of the accounts that Mr. Hess oversaw were law firms or other entities in the legal industry in the DMV area. During his employment with DTI, he had access to DTI's confidential and proprietary information.

On April 25, 2018, Mr. Hess signed an Employment, Confidential Information, Invention Assignment, and Arbitration Agreement ("Agreement"). This Agreement included a non-compete clause, which states:

> **NON-COMPETITION.** I recognize and acknowledge that by virtue of accepting employment hereunder, I will acquire valuable knowledge, enhance my professional skills and experience, and learn proprietary trade secrets and Confidential Information of the Company and its customers. In consideration of the foregoing and this agreement, I agree that for a period of twelve (12) months immediately following the termination of my employment with the Company for any reason, I will not compete against the Company or any subsidiary or affiliate to which I provided services during the course of my employment with the Company, or engage in employment with or provide independent contractor or consulting services for any person, corporation, firm or other entity which provides any service or services which are the same or similar to the service or services offered by the Company or any subsidiary or affiliate to which I provided services during the course of my employment with the Company, within the relevant territories. I agree to the reasonableness of the restraint imposed under this paragraph.

The Agreement also contained a non-solicitation clause, which states:

> **NON-SOLICITATION OF CUSTOMERS.** I acknowledge and agree that the identity of the Company's customers and specifics related thereto constitute Confidential Information of the Company, and that my sale or unauthorized use or disclosure of any such Confidential Information would constitute unfair competition. Accordingly, I agree that for a period of twelve (12) months immediately following the termination of my employment relationship with the Company for any reason, I shall not, directly or indirectly, either on behalf of myself or for any other person, corporation, firm, company or other business entity, do any of the following acts: (a) solicit, serve or cater to any of the Company's customers whom I solicited, served or catered to on behalf of the Company or with whom I became acquainted during the course of my employment with the Company; (b) divert or attempt to divert any of the Company's customers or any of the business or patronage of such customers; or (c) call upon, influence or attempt to influence any of the Company's customers to transfer their business or

patronage from the Company to me or to any other person, corporation, firm, company or business entity engaged in a business similar to the Company's business.

The Agreement also contained a confidential information clause, which states:

**CONFIDENTIAL INFORMATION.** I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use or disclose to any person, firm or corporation, except for the direct benefit of the Company, any Confidential Information of the Company or any of its customers. I understand that "Confidential Information" means any information of the Company, its vendors or its customers including but not limited to any proprietary information, technical data, trade secrets or know-how, information relating to research, product plans, products, services, customer lists, customers, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration, marketing or finances, or other business information in any form including but not limited to electronic, oral, visual, or hard copy. I further understand that Confidential Information does not include any of the foregoing information or items that are publicly known and generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item(s) or information involved.

Mr. Hess claims that he expressed concern to Mr. Ferguson about suddenly being asked to sign the Agreement three years into his employment with DTI. Mr. Ferguson told Mr. Hess that he would have to sign the Agreement if he wanted to continue working at DTI. Mr. Hess claims that Mr. Ferguson assured him that DTI would not actually enforce the Agreement against him, at which point Mr. Hess agreed to sign the document.

On September 16, 2019, Mr. Hess submitted his letter of resignation (effective September 27, 2019) to Mr. Ferguson. He indicated that he would be taking a new job at Forrest Solutions, which is a competitor of DTI. Mr. Hess told Mr. Ferguson that Forrest Solutions has a focus outside the legal community and said that he would be taking over the southeast region down to Florida. The parties dispute whether Mr. Hess misled or intended to mislead Mr. Ferguson about the nature of his new job during this conversation.

In his new position at Forrest Solutions, Mr. Hess has worked with Ogletree, Deakins, Nash, Smoak & Stewart, P.C.'s Washington, D.C. office ("Ogletree"). DTI claims that it has previously made efforts to perform staffing for copy room services as well as front desk services for Ogletree, but it does not appear that Ogletree was ever DTI's customer.[1] DTI believes Mr. Hess's work with Ogletree violates the Agreement, and it sent cease & desist letters to both Mr. Hess and Forrest Solutions. DTI is broadly concerned about Mr. Hess's employment with Forrest Solutions, claiming that he should not be permitted to do this work, particularly in the DMV area. DTI has also raised concerns about Mr. Hess's knowledge of DTI's confidential and proprietary information.

On October 29, 2019 DTI filed a Complaint against Mr. Hess. ECF No. 1. On November 26, 2019, DTI filed its TRO application.[2] Later that same day, Mr. Hess agreed during a telephone conference with the plaintiff and the Court that he would not enter the Ogletree premises nor serve as Forrest Solutions' representative to Ogletree during the pendency of this lawsuit, and the Court entered a Minute Order requiring him to abide by that agreement on November 27, 2019.

## **LEGAL STANDARD**

Injunctive relief is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant bears the burden of demonstrating that: (1) it has a substantial likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; (3) other interested parties will not suffer substantial harm if the injunction is granted; and (4) the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel*

---

[1] Although Ogletree is not one of DTI's clients, Ogletree is representing DTI in this lawsuit.
[2] That application fully complied with Federal Rule of Civil Procedure 65, which governs TROs.

*Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The Court considers the same factors in deciding whether to issue a TRO as it does when deciding whether to issue a preliminary injunction. *Baker DC, LLC v. National Labor Relations Board*, 102 F. Supp. 3d 194, 198-99 (D.D.C. 2015).

## ANALYSIS

Upon consideration of the four factors listed above, the Court finds that DTI has not met its heavy burden to show that a TRO is necessary. The Court will therefore deny the TRO request. DTI has indicated that if its TRO application is denied, it will "promptly file a separate motion to request leave of Court to pursue limited, expedited discovery which would be used in support of Plaintiff's expected Motion for Preliminary Injunction." ECF No. 9 at 5. Specifically, DTI plans to ask this Court for leave "to issue a subpoena *duces tecum* to Forrest Solutions for documents relating to Mr. Hess' employment with them, whether he has entered into a noncompetition agreement with them, and the extent to which he has engaged in conduct while working for Forrest Solutions which violated his continuing contractual obligations to DTI." ECF No. 14 at 9. DTI also plans to request "leave to depose Defendant Hess within seven (7) calendar days after it receives documents in response to the subpoena *duces tecum* to Forrest Solutions." *Id.* If DTI decides to pursue that course of action, the Court will thoroughly consider DTI's motion as well as any opposition thereto.

**I. It is Unclear Whether Plaintiff has a Substantial Likelihood of Success on the Merits.**

The first factor to consider is whether the movant has a substantial likelihood of success on the merits. Although DTI very well *could* succeed on the merits, it has failed to prove that such success is *substantially* likely. The Court firmly disagrees with Mr. Hess's assertion that "DTI has no chance of succeeding on the merits," (ECF No. 10 at 9) but DTI's ultimate success

5

does hinge in part on the validity of the Agreement. The Agreement is governed by Georgia law, meaning that the parties will be making arguments regarding both Georgia contract law and the Restrictive Covenant Act (GA. CODE ANN. §§ 13-8-50) as well as any other statutes that may apply. The Court cannot declare that DTI has a substantial likelihood of success on the merits without first providing the parties an opportunity to brief those legal issues affecting the enforceability of the Agreement. Additionally, Mr. Hess's opposition to the TRO application raises potentially troubling circumstances surrounding Mr. Hess's consent to the Agreement. The Court cannot speculate as to the validity of the agreement without a full understanding of the facts that led him to sign the Agreement and without providing the parties an opportunity to explain why those circumstances are or are not relevant to the Agreement's enforceability. Essentially, although DTI has certainly raised a facially valid claim against Mr. Hess, its ultimate success remains an open question. Furthermore, even if this factor did weigh in DTI's favor, as explained below, the second factor would still lead the Court to deny the TRO application.

**II. Plaintiff Failed to Demonstrate Imminent, Concrete, Irreparable Harm.**

DTI has not met its heavy burden under the second factor to show that it will suffer imminent and irreparable harm absent a TRO. Issuance of a TRO may not be based on a mere "possibility of irreparable harm." *Winter*, 555 U.S. at 22. Rather, it "requires a clear showing" of irreparable harm entitling the movant to this "extraordinary remedy." *Id.* Although there is a chance that Mr. Hess's employment with Forrest Solutions could lead to some harm, DTI has not yet suffered irreparable damage, nor has it alleged with the requisite specificity what such damage would look like if it were to occur in the near future.

DTI has alleged six different types of harm that it believes warrant a TRO:

6

- **Irreparable Harm – Issue No. 1** – The great risk of irreparable damage to its customer relationships because Mr. Hess is working for a direct competitor in the same territory that he worked in for DTI;

- **Irreparable Harm – Issue No. 2** – The fact that an account for DTI in Baltimore, Maryland, is coming up for rebid in November 2019, and other accounts that Mr. Hess worked on for DTI will also be coming up for rebid within the next year, and the significant risk [he] could work to help Forrest Solutions capture the business that DTI is currently performing;

- **Irreparable Harm – Issue No. 3** – The fact that Mr. Hess could readily use the good will that belongs to DTI as well as the in-depth confidential and proprietary information that he gained while working for DTI for the benefit of Forrest Solutions for DTI's other accounts and prospective accounts;

- **Irreparable Harm – Issue No. 4** – The heightened threat of irreparable harm to DTI based upon the blatant, willful nature of Mr. Hess' wrongful conduct;

- **Irreparable Harm – Issue No. 5** – The fact that the forms of irreparable harm which Plaintiff will suffer if a TRO is not granted cannot be reasonably quantified and remedied via monetary damages; and

- **Irreparable Harm – Issue No. 6** – The imminent and grave likelihood of irreparable harm if Defendant Hess were permitted to continue to enter Ogletree's Washington, D.C. office and if he were permitted to continue to manage the account on behalf of Forrest Solutions, due to the significant risks that such would pose to the integrity of the litigation process in this case.

ECF No. 14 at 5-6. After analyzing each of the six harms, however, the Court finds insufficient grounds to issue a TRO.

Issue No. 1 asserts that Mr. Hess could harm DTI by working for its direct competitor in the DMV area. Although theoretically this could be true, DTI has failed to state with any specificity what that harm looks like. It has not alleged any precise facts about what Mr. Hess has done to take business away from DTI. Although working for a direct competitor may be in violation of the Agreement (which will be determined during the merits stage of the litigation), a

violation of the Agreement on its own is not sufficiently harmful to warrant the issuance of a TRO.

Issue No. 2 discusses accounts that are coming up for rebid in the near future and with which DTI is concerned that Mr. Hess may interfere. Mr. Hess, however, has stated that he does not even know what accounts DTI is referring to, and DTI has not disclosed those names. Even if DTI were to disclose those names, DTI would need to establish that Mr. Hess is currently trying to foster a relationship with those customers on Forrest Solutions' behalf or is otherwise acting in a manner that harms DTI's chances of securing a rebid. Issue No. 2 is simply too vague to constitute irreparable harm worthy of a TRO.

Issue No. 3 raises concerns that Mr. Hess had access to DTI's proprietary and confidential information. DTI, however, has failed to establish that Mr. Hess has used or is planning to use that information to benefit Forrest Solutions or to harm DTI. DTI cited *Robert Half Int'l Inc. v. Billingham* in arguing that this Court should grant its TRO application. 315 F. Supp. 3d 419, 432-34 (D.D.C. 2018). In *Billingham*, the plaintiff established that the defendant had actually disclosed confidential information, which constitutes irreparable harm "because such information, once disclosed, loses its confidential nature." *Id.* at 433 (quoting *Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010). In contrast, DTI has made no such showing of actual disclosure in this case. The mere fact that Mr. Hess knows the information may make DTI uneasy or apprehensive, but uneasiness and apprehension are not the types of concrete harm with which TROs are concerned.

Issue No. 4 asks for a TRO based on the "blatant, willful nature" of Mr. Hess's wrongful conduct. This assertion is exceedingly vague, but the Court takes it to mean that a TRO is necessary because Mr. Hess intentionally violated the Agreement. If this interpretation is correct,

DTI is asking the Court to issue a TRO simply because Mr. Hess allegedly violated the Agreement. The alleged violation of the Agreement is undoubtedly upsetting and concerning to DTI, but it is a far cry from irreparable harm necessitating a TRO.

Issue No. 5 explains that DTI believes a TRO is necessary because monetary damages could not be readily quantified and would not be an adequate remedy. This assertion, however, does not constitute a harm in and of itself; rather, it presupposes the existence of concrete harm. Because DTI has failed to prove that it would be irreparably harmed by any specific conduct of Mr. Hess, monetary damages would be an adequate remedy if DTI ultimately succeeds on the merits. DTI would undoubtedly prefer to preempt these theoretical harms through a TRO, but that does not change the fact that DTI has not shown how irreparable injury would result absent that TRO.

Issue No. 6 deals specifically with Mr. Hess's work with Ogletree. Based on Mr. Hess's agreement not to have contact with Ogletree during the pendency of this litigation and the Court's Minute Order of November 27, 2019, Issue No. 6 is clearly moot. Mr. Hess cannot pose any "significant risks to the integrity of the litigation process" if he has no further contact with Ogletree. Therefore, Mr. Hess's past involvement with Ogletree is insufficient to warrant a TRO.

The second factor is of vital importance to the TRO analysis. Even if all three additional TRO factors indicate that a TRO is warranted, failure to show specific, concrete, irreparable harm is still "grounds for refusing to issue a preliminary injunction." *England*, 454 F.3d at 297. Therefore, even if the other three factors weighed in DTI's favor, the Court would still refuse to issue a TRO in this case.

**III. A Temporary Restraining Order Could Substantially Injure Mr. Hess.**

A TRO would injure Mr. Hess, as it would effectively prevent him from continuing with his job at Forrest Solutions. Of course, if his actions leading up to this litigation truly violated a valid and enforceable employment contract, then such injury would be irrelevant. If, however, there is some legal or factual reason why Mr. Hess is not in breach of the Agreement, issuing a TRO would be a significant burden. Therefore, in this case, the analysis of the first factor is directly tied to the analysis of this third factor.

DTI also raises the argument that the Court should issue a TRO because Mr. Hess consented to it by signing the Agreement. Not only does this argument presume that the Agreement is enforceable, but it ignores the fact that DTI has failed to allege any irreparable injury under the second factor. Although Mr. Hess may have acknowledged that DTI would be entitled to injunctive relief if he violated the Agreement, such acknowledgement does not meet the legal standard for this Court to issue a TRO. DTI even concedes that a defendant's consent to the issuance of equitable relief is merely one issue to be considered. *Billingham*, 315 F. Supp. 3d at 433. In light of DTI's inability to show irreparable harm under the second factor, Mr. Hess's supposed consent is not a sufficient reason to grant the TRO application. Furthermore, even if the third factor did weigh in DTI's favor, the second factor alone would still lead the Court to deny the TRO application.

**IV. A Temporary Restraining Order Could Potentially Further the Public Interest.**

If Mr. Hess did violate a binding employment contract, then issuing a TRO would further the public interest by ensuring that people are bound by their agreements. It would also send a message that employment contracts are enforceable. As explained in the analysis of the first factor, however, it is not entirely clear what happened in this case. Not only would DTI need

more facts to prove all of its allegations against Mr. Hess, but there are legal issues regarding the enforceability of the Agreement that the Court has not yet had the opportunity to consider fully. Therefore, in this case, the analysis of the first factor is directly tied to the analysis of this fourth factor. Although a TRO that protects a party to a contract can in some circumstances further the public interest, that is not necessarily what would be happening here. Furthermore, even if this factor did clearly weigh in DTI's favor, the second factor would still lead the Court to deny the TRO application.

## CONCLUSION

Based on the foregoing, the Court will **DENY** plaintiff Document Technologies, LLC's application for a Temporary Restraining Order (ECF No. 7) against defendant David Hess.

A separate Order accompanies this Memorandum Opinion.

Date: 12/19/16

Royce C. Lamberth
United States District Court Judge